## UNITED STATES

v.

**John JOSEPH, 367 76 9135, Journalist Second Class (E–5), U.S. Navy.**

**NMCM 90 3256.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 3 April 1990.

Decided 15 Nov. 1991.

LT R.M. Medeiros, JAGC, USNR, Appellate Defense Counsel.

LT Dwight N. Mersereau, JAGC, USNR, Appellate Government Counsel.

Before JONES, REED and LAWRENCE, JJ.

REED, Judge:

Before a general court-martial composed of a military judge alone, and pursuant to his pleas, appellant was found guilty of a violation of a lawful regulation by using a government vehicle for personal use in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892; the wrongful appropriation of a government camera and lens in violation of Article 121, UCMJ, 10 U.S.C. § 921; and wrongfully engaging in sexual intercourse in violation of Article 134, UCMJ, 10 U.S.C. § 934. Despite his not guilty pleas, he was also found guilty of an aggravated assault in violation of Article 128, UCMJ, 10 U.S.C. § 928. He was sentenced to a dishonorable discharge, reduction to pay grade E–1, forfeiture of all pay and allowances, and confinement for 30 months. The convening authority approved the sentence but suspended all confinement in excess of 6 months pursuant to a pretrial agreement.

Appellant assigns two errors that will be dealt with ad seriatim.

I

THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT COMMITTED AN ASSAULT BY A MEANS LIKELY TO PRODUCE DEATH OR GRIEVOUS BODILY HARM AS ALLEGED IN CHARGE III.

The sole specification under Charge III alleges that the appellant committed an

assault upon a female naval reservist, not his wife (hereinafter Petty Officer W), "by unlawfully having sexual intercourse with her, [the intercourse being] a means likely to produce death or grievous bodily harm" because appellant then "knew his seminal fluid contained a potentially deadly virus (Human Immunodeficiency Virus) which was capable of being transmitted by sexual intercourse." The specification further alleges that this rendered sexual intercourse inherently dangerous and nullified any apparent consent on the part of Petty Officer W because the appellant failed to inform her that he was carrying such a virus.

To date, military case law has dealt with incidents involving nonconsensual and unprotected sexual intercourse which risked the transmission of the HIV virus thereby using semen in a deadly way. *United States v. Johnson*, 30 M.J. 53 (C.M.A.1990); *United States v. Stewart*, 29 M.J. 92 (C.M.A.1989); *United States v. Womack*, 29 M.J. 88 (C.M.A.1989); *United States v. Woods*, 28 M.J. 318 (C.M.A.1989). In this case we deal with an incident involving nonconsensual but "protected" sexual intercourse; nevertheless we affirm appellant's guilt of an assault using a means likely to produce death or grievous bodily harm. The means likely is again the seminal fluid of the appellant containing the potentially deadly virus (HIV), capable of being transmitted by sexual intercourse, and rendering even "protected" sexual intercourse inherently dangerous.

The facts reveal that sometime around June, 1988, the appellant was told that he had tested positive for the Human Immunodeficiency Virus (HIV); he was sent to Oakland Medical Center for further tests and counseling. Oakland confirmed that the appellant was HIV positive. He was told that the virus was potentially dangerous and that it could be transmitted to another human being by sexual intercourse. As part of the counseling at Oakland he was advised that death or great bodily harm was a probable and eventual consequence of infecting someone with the HIV virus. He was also issued a four-page counseling sheet which he acknowledged. That document contained information which indicated that a condom helped reduce the spread of HIV. It also indicated that sexual intercourse would be safer when nonoxynol–9, a spermatocide, was used with a condom. However, the information provided in this document stressed that sexual intercourse spreads the virus and the *"only absolute way to prevent this is not to have sex."* (Emphasis added.) At trial the appellant acknowledged that the counseling sheet contained information "about the same similar (sic) type of counseling that [he] was already getting in the groups," that is, group sessions at Oakland.

■■■ Thus the appellant knew, prior to his sexual relations with Petty Officer W, that sexual relations with her were unsafe, even using a condom and even if the condom was used with nonoxynol–9. The appellant admits that he had sexual intercourse with Petty Officer W on 22 January 1989 after testing positive for the HIV virus and knowing that he had tested positive for the virus. He did not inform her that he was a carrier of the HIV virus prior to the act of intercourse but did have a condom on at the time of intercourse. At trial Petty Officer W. testified that she agreed to have sex with appellant on 22 January:

Q. Now, once the subject of sex had been raised did you talk about contraception?

. . . .

WITNESS [Petty Officer W]: Okay. Yes, I did. I told him that I was not really that sexually active and involved. I wasn't on no (sic) birth control pills or anything so therefore we would definitely have to use a condom.

Q. Did he respond?

A. Yes, he responded immediately, saying he didn't use condoms.

Q. Did he ever offer to use a condom?

A. No. I reiterated the fact that—I said, "Well, I'm not on the pill yet, and my age, my body is, you know built up and ripe for pregnancy and we'll have to use one." And then I said, "Well, anyway in this day and age it's, you know,

it's the safe thing to do. There's a lot going on out there."

Q. Once you said that what did Petty Officer Joseph do?

A. Just sort of shook his head a little bit like, you know, like he told me he wouldn't make me pregnant. He would know when to quit. I told him I didn't trust that method because, you know, it didn't take that much. You don't have to have a full orgasm and all that. I don't trust that. And he was sort of resentful but I just finally laid down the ultimatum, we either use a condom or we weren't going to do anything.[1]

As a result of the conversation, appellant went to a nearby store and purchased a condom. He alleges the condom contained nonoxynol–9. Petty Officer W indicates she examined the condom and found it to be dry. During intercourse, she became uncomfortable and asked him to withdraw. This appellant did, and he was fully erect upon withdrawal. Appellant indicates the condom was intact upon withdrawal; Petty Officer W disagrees, indicating the head of appellant's penis was fully exposed as a result of a break in the condom.[2] The appellant indicates no ejaculation occurred; Petty Officer W's testimony is ambiguous and not clear in this regard. This was the one and only time appellant and Petty Officer W had sexual intercourse.

Appellant argues that the conviction for aggravated assault must be set aside because he used a condom during intercourse and did not ejaculate; therefore, there was no assault. We hold otherwise. He alleges further that Petty Officer W consented to the intercourse. We disagree as noted above in footnote one.

Dr. Garst, the appellant's attending physician and counsellor, testified that HIV is transmitted through fluids or secretions to include both the vesicle fluid and the ejaculate itself. He testified that his "only conclusion ... [was] that both would be considered equally infectious." He also noted that "(i)n heterosexual relationships the transmission of HIV virus from an infected man to an uninfected woman is more efficient than the transmission of virus from an infected woman to an uninfected man." Further Dr. Garst testified that

> the magnitude of the likelihood of transmitting HIV through a single sexual encounter is small. Whether that is fair to call small when you're dealing with something of this importance is a judgmental decision.

> . . . .

> There are clearly, however, descriptions of women who have become infected with the HIV virus after only one or a handful of sexual encounters. In those descriptions there really isn't any clear specification as to whether condoms were used or not.

Q. Have there been any studies on the effectiveness of condoms in terms of the transfer for HIV?

A. There are studies in the laboratory that look at the permeability of the mate-

---

1. Based on this testimony of Petty Officer W, we are unwilling to ascribe to her a knowing consent to be placed at risk to the AIDS virus through sexual intercourse with someone she was not aware was HIV positive. Rather, we find her concern focused on her fear of becoming pregnant and a general fear of sexually transmitted diseases absent the use of a condom. We are not, therefore, called upon today to decide whether an assault would lie if there were knowing consent to sexual intercourse with another known to have tested positive for HIV. The general rule, however, is that one cannot lawfully consent to a battery that is likely to produce death or serious bodily injury. *See United States v. Holmes,* 24 C.M.R. 762 (A.F.B.R.1957) and the citations contained therein; *United States v. O'Neal,* 16 U.S.C.M.A. 33, 36 C.M.R. 189 (1966). The Air Force Court

of Military Review has noted in *United States v. Womack,* 27 M.J. 630 (A.F.C.M.R.1988) *(en banc ), aff'd,* 29 M.J. 88 (C.M.A.1989), that a New York appellate court has suggested that even certain heterosexual marital contacts might constitutionally be limited to avoid transmission of the virus. *See Doe v. Coughlin,* 71 N.Y.2d 48, 518 N.E.2d 536, 523 N.Y.S.2d 782 (1987).

2. Possible breakage of a condom during sexual intercourse is one of the reasons condoms cannot be considered invariably reliable for prevention of disease or pregnancy. We are aware that other reasons include defective workmanship, improper usage, carelessness in use, their permeability in certain instances when used for a purpose not originally contemplated, et cetera.

rial used in condoms. Those studies would lead you to suspect that condoms might be extremely effective.

On the other hand, one must balance that with a total lack of information on whether condoms are effective in real life situations involving human beings and one is reminded of the experience with condoms in preventing pregnancy, and that experience suggests that condoms by themselves are rather inefficient in that regard. Even with recent improvements in the manufacture of condoms, couples relying solely on condoms to prevent pregnancy end up getting pregnant about five to fifteen percent of the time over a year or two period leading one to conclude that they are not likely to be 100–percent effective in preventing . the transmission of anything else.

. . . .

[I]t is absolutely known that the use of condoms does not reduce the risk of transmission to zero.

Q. Doctor, now to a more physiological type of question. In terms of semen and ejaculation, do you know whether or not a full ejaculation is required in order to transfer the virus.

A. . . . All I can refer to once again is the known risk of pregnancy in situations where the penis was withdrawn before the main part of ejaculation began.

That sort of activity is considered highly risky when the issue was pregnancy. I would only assume that it would continue to be a risk with the transmission of other things.

Q. So it would be fair to say that some fluid is present without an ejaculation?

A. Oh, clearly.

The Court of Military Appeals has specifically found that an accused's semen containing HIV is a means likely to produce death or grievous bodily harm. *United States v. Johnson*, 30 M.J. 53 (C.M.A.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990). In order for a conviction for aggravated assault to be upheld in this case, however, it must be shown that the appellant's seminal fluid was used "in a manner likely to produce death or grievous bodily harm." Manual for Courts Martial, United States, 1984, part IV, paragraph 54(c)(4)(a)(i).

■ Whether the conduct of the accused charged as an aggravated assault involves a means used in a manner likely to produce death or grievous bodily harm ultimately becomes a question to be determined by the fact finder. *Johnson* at 57. The evidence need not establish that death or grievous bodily harm was highly probable or even more likely than not, and no required statistical probability can be found in decisional law.[3] It is for the fact finder to consider all the evidence and determine beyond a reasonable doubt whether the risk of harm meets the general statutory requirement, although the law clearly does require that the risk amount to more than "merely a fanciful, speculative, or remote possibility" of harm. *Id.*

■ The facts adduced at trial showed that the appellant knew he was HIV positive; knew that the HIV could be transmitted through sexual intercourse; and knew that a condom, even one used with nonoxynol–9, was not a surety for the non-transfer of the HIV. The evidence at trial also showed that use of condoms by couples over a year or two year period resulted in pregnancies in five to fifteen percent of the

---

**3.** *See, e.g., United States v. Brantner*, 28 M.J. 941 (N.M.C.M.R.1989), *pet. denied*, 29 M.J. 314 (C.M.A.1990) (accused's use of needles and syringes on another when he was not medically trained constituted a means likely even though no permanent injury was alleged or shown); *United States v. Cato*, 17 M.J. 1108 (A.C.M.R.1984) *pet. denied*, 19 M.J. 119 (C.M.A.1984) (a loaded rifle with a round jammed backward in the chamber held to be a dangerous weapon); *United States v. Lamp*, 44 C.M.R. 504 (A.C.M.R.1971) (fully functional M–1 held to be a dangerous weapon where live ammunition was contained in the magazine although no round was chambered); *United States v. Redding*, 14 U.S.C.M.A. 242, 34 C.M.R. 22 (1963) (accused found guilty of assault with dangerous weapon where he wounded friend with a bullet to the chest, even though he believed he had unloaded his weapon before indulging in a fast draw practice).

women involved, a statistic that strongly suggests the limited protection condoms provide from the deadly HIV virus. Yet appellant had sexual intercourse with Petty Officer W without revealing to her that he had the virus and without obtaining her knowing consent to the intercourse. There is no conflict in the record over the fact that appellant's conduct exposed Petty Officer W to a substantial risk of developing the deadly disease, AIDS.

As in *Johnson,* supra, we believe the expert medical testimony and the other evidence adduced at trial to be sufficient to establish the appellant's guilt beyond a reasonable doubt of the aggravated assault.

## II

### A SENTENCE WHICH INCLUDES A DISHONORABLE DISCHARGE IS INAPPROPRIATELY SEVERE

■ During the sentencing portion of the trial proceedings the following facts were adduced. Petty Officer W tested positive for HIV in June 1989. She had had no sexual involvement with anyone else for at least a year prior to her sexual intercourse with the appellant and had had no sexual relations with anyone else since the intercourse with the appellant. Appellant indicated remorse for what he had done and indicated he never intended to hurt anybody. He stated that he really felt that by using a condom with nonoxynol–9 he was not going to hurt Petty Officer W.

We find the appellant's statement to be self-serving and worthy of little belief. Without Petty Officer W's insistence on use of a condom, appellant would not have used one. Nor did he advise Petty Officer W that he had tested positive for HIV prior to having sexual intercourse with her. Appellant admitted that Petty Officer Saunders, a preventive medicine technician, and Dr. Garst, his physician, both told him that use of a condom and nonoxynol–9 would not invariably prevent transmission of the virus. When questioned by Petty Officer W after she fell ill and later after she tested positive for HIV, appellant denied that he had tested positive for HIV. Because of appellant's callousness, it is un-

likely that Petty Officer W will live a long and normal life.

Notwithstanding appellant's previous outstanding service record, we find that a dishonorable discharge is particularly appropriate in the circumstances of this case.

The findings of guilty and the sentence as approved on review below are affirmed.

Senior Judge JONES and Judge LAWRENCE concur.