**UNITED STATES, Appellee,**

v.

**John JOSEPH, Journalist Second Class, U.S. Navy, Appellant.**

No. 67,605.
CMR No. 90 3256.

U.S. Court of Military Appeals.

Argued Nov. 30, 1992.
Decided Sept. 10, 1993.

For Appellant: *Captain Dwight H. Sullivan, USMC* (argued); *Lieutenant Mary L. Livingston, JAGC, USNR* (on brief).

For Appellee: *Lieutenant Dwight N. Mersereau, JAGC, USNR* (argued); *Colonel T.G. Hess, USMC* and *Commander W.F. Shields, JAGC, USN* (on brief).

*Opinion of the Court*

COX, Judge:

A military judge sitting alone as a general court-martial convicted appellant, contrary to his pleas, of aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm, *inter alia,* in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928.[1] The granted issue asks whether the Court of Military Review erred by affirming the findings of guilty to such aggravated assault where appellant, who was infected with the Human Immunodeficiency Virus (HIV), had protected sexual intercourse.

I

Approximately 6 months after being informed that he had tested positive for HIV, appellant engaged in ostensibly protected sexual intercourse with Petty Officer W without informing her that he carried the virus. Apparently as a result of the sexual contact, Petty Officer W contracted HIV.

The Court of Military Review set forth the following factual summary (*see* Art. 66(c), UCMJ, 10 USC § 866(c)):

The facts reveal that sometime around June, 1988, the appellant was told that he had tested positive for the Human Immunodeficiency Virus (HIV); he was sent to Oakland Medical Center for further tests and counseling. Oakland confirmed that the appellant was HIV positive. He was told that the virus was potentially dangerous and that it could be transmitted to another human being by sexual intercourse. As part of the counseling at Oakland he was advised that death or great bodily harm was a probable and eventual consequence of infecting someone with the HIV virus. He was also issued a four-page counseling sheet which he acknowledged. That document contained information which indicated that a condom helped reduce the spread of HIV. It also indicated that sexual intercourse would be safer when nonoxynol–9, a spermatocide, was used with a condom. However, the information provided in the document stressed that sexual intercourse spreads the virus and the *"only absolute way to prevent this is not to have sex."* ... (Emphasis added.) At trial the appellant acknowledged that the counseling sheet contained information "about the same similar [sic] type of counseling that [he] was already getting in the groups," that is, the group sessions at Oakland.

Thus the appellant knew, prior to his sexual relations with Petty Officer W, that sexual relations with her were unsafe, even using a condom and even if the condom was used with nonoxynol–9. The appellant admits that he had sexual

---

1. In accordance with his pleas, appellant was also found guilty of one specification each of disobeying a lawful regulation; of wrongful appropriation of government property; and of wrongful sexual intercourse, in violation of Articles 92, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 921, and 934, respectively. The military judge acquitted appellant of one specification of dereliction of duty charged under Article 92 (GCMO No. 30–90 dated 5 Sep. 90 erroneously reflects this finding) and dis-missed a second specification of wrongful appropriation as multiplicious.

Appellant was sentenced to a dishonorable discharge, confinement for 30 months, total forfeitures, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged but suspended confinement in excess of 6 months pursuant to the pretrial agreement. The Court of Military Review affirmed the findings and sentence. 33 MJ 960 (1991).

intercourse with Petty Officer W on 22 January 1989 after testing positive for the HIV virus and knowing that he had tested positive for the virus. He did not inform her that he was a carrier of the HIV virus prior to the act of intercourse but did have a condom on at the time of intercourse. At trial Petty Officer W testified that she agreed to have sex with appellant on 22 January[.]

\* \* \*

As a result of ... [a] conversation [in which Petty Officer W refused to have unprotected sex with Petty Officer Joseph], appellant went to a nearby store and purchased a condom. He alleges the condom contained nonoxynol–9. Petty Officer W indicates she examined the condom and found it to be dry. During intercourse, she became uncomfortable and asked him to withdraw. This appellant did, and he was fully erect upon withdrawal. Appellant indicates the condom was intact upon withdrawal; Petty Officer W disagrees, indicating the head of appellant's penis was fully exposed as a result of a break in the condom. The appellant indicates no ejaculation occurred; Petty Officer W's testimony is ... not clear in this regard. This was the one and only time appellant and Petty Officer W had sexual intercourse.

\* \* \*

Dr. Garst, the appellant's attending physician and counselor, testified that HIV is transmitted through fluids or secretions to include both the vesicle fluid and the ejaculate itself. He testified that his "only conclusion ... [was] that both would be considered equally infectious." He also noted that "[i]n heterosexual relationships the transmission of HIV virus from an infected man to an uninfected woman is more efficient than the transmission of virus from an infected woman to an uninfected man." Further Dr. Garst testified that the magnitude of the likelihood of transmitting HIV through a single sexual encounter is small. Whether that is fair to call small when you're dealing with something of this importance is a judgmental decision.

\* \* \*

There are clearly, however, descriptions of women who have become infected with the HIV virus after only one or a handful of sexual encounters. In those descriptions there really isn't any clear specification as to whether condoms were used or not.

Q. Have there been any studies on the effectiveness of condoms in terms of the transfer of HIV?

A. There are studies in the laboratory that look at the permeability of the material used in condoms. Those studies would lead you to suspect that condoms might be extremely effective.

On the other hand, one must balance that with the total lack of information on whether condoms are effective in real life situations involving human beings and one is reminded of the experience with condoms in preventing pregnancy, and that experience suggests that condoms by themselves are rather inefficient in that regard. Even with recent improvements in the manufacture of condoms, couples relying solely on condoms to prevent pregnancy end up getting pregnant about five to fifteen percent of the time over a year or two period leading one to conclude that they are not likely to be 100–percent effective in preventing the transmission of anything else.

\* \* \*

[I]t is absolutely known that the use of condoms does not reduce the risk of transmission to zero.

Q. Doctor, now to a more physiological type of question. In terms of semen and ejaculation, do you know whether or not a full ejaculation is required in order to transfer the virus[?]

A. ... All I can refer to once again is the known risk of pregnancy in situations where the penis is withdrawn before the main part of ejaculation began.

That sort of activity is considered highly risky when the issue was pregnancy. I would only assume that it would continue to be a risk with the transmission of other things.

Q. So it would be fair to say that some fluid is present without an ejaculation?

A. Oh, clearly.

33 MJ 960, 962–64 (1991) (footnote omitted).

## II

We must determine whether the evidence, viewed "in the light most favorable to the" Government, is sufficient to support a finding of aggravated assault. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 MJ 324 (CMA 1987).

Article 128(b)(1) provides:

Any person subject to this chapter who ... commits an *assault* with a dangerous weapon or other *means or force likely to produce death or grievous bodily harm* ... is guilty of aggravated assault and shall be punished as a court-martial may direct.

(Emphasis added.) [2]

▮▮▮ We first consider whether there is sufficient evidence to conclude that appellant's conduct amounted to an assault. It is black letter law that every battery includes an assault. As Colonel Winthrop put it years ago:

A battery, or assault and battery,—for the two terms are substantially equivalent, every battery including an as-sault,—is any unlawful violence inflicted upon a person without his or her consent. *Military Law and Precedents* 687 (2d ed. 1920 Reprint). *See also* W. LaFave and A. Scott, *Substantive Criminal Law* § 7.14(a) at 300 (1986); R. Perkins and R. Boyce, *Criminal Law* 159–61, 173–77 (3d ed.1982); J. Miller, *Handbook of Criminal Law* 312–13 (1934); 1 W. Russell, *A Treatise On Crimes and Misdemeanors* 750 (1845); para. 207a, Manual for Courts–Martial, United States, 1951, at 371; *cf.* Legal and Legislative Basis, Manual for Courts–Martial, United States, 1951, at 285.

Thus, one means of proving an assault is to prove a battery (in military parlance, an "assault consummated by a battery." *See* para. 54b(4)(a), Part IV, Manual for Courts–Martial, United States, 1984). Proving an assault consummated by a battery was the route taken by the prosecution in the instant case.[3]

Further, the *actus reus* of assault consummated by a battery (or "bodily harm") includes "any offensive touching of another, however slight." Para. 54c(1)(a), Part IV, 1984 Manual, *supra; see, e.g.,* W. LaFave and A. Scott, *supra* at § 7.15 at 301. We can think of no reason why a factfinder cannot rationally find it to be an "offensive touching" when a knowingly HIV-infected person has sexual intercourse with another, without first informing his sex partner of his illness—regardless whether protective measures are utilized.[4] Given the conse-

---

**2.** The President, in paragraph 54b(4)(a), Part IV, Manual for Courts–Martial, United States, 1984, breaks down the elements of assault with a dangerous weapon or other means likely to produce death or grievous bodily harm, as follows:
(i) That the accused attempted to do, offered to do, or did bodily harm to a certain person;
(ii) That the accused did so with a certain weapon, means, or force;
(iii) That the attempt, offer, or bodily harm was done with unlawful force or violence; and
(iv) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

**3.** This case involved a deliberate, physical touching, *i.e.,* sexual intercourse. This fact alleviates the need to ponder whether an intentional touching satisfies an "attempt-to-do-bodily-harm" theory or an "offer-to-do-bodily-harm"

theory. The relevant questions here are whether this touching *constituted* "bodily harm" and whether it was done "in a manner likely to produce death or grievous bodily harm." Hence my opinion proceeds directly to those matters. When a case is presented that fairly requires us to decide whether our statute permits assault charges based on bodily harm inflicted through negligence or culpable negligence, I will endeavor to answer those questions. *See* R. Perkins and R. Boyce, *Criminal Law* 175–76 (3d ed.1982). In the meantime, I prefer not to obscure today's holding with collateral, academic discussion.

**4.** Contrary to Judge Wiss' assertion, 37 MJ at 402 n.2, it is *precisely* the act of intercourse, under the circumstances here, that is sufficient to amount to an assault by offensive touching. Art. 128, UCMJ, 10 USC § 928. The fact that

quences of Acquired Immune Deficiency Syndrome (AIDS), the label "offensive touching" seems rather mild for such unwarned, intimate contact with an HIV-infected person. We assume most unwitting sex partners, including the victim herein, could readily think of more graphic descriptions for such behavior. We hold that a rational factfinder could find, beyond a reasonable doubt, that appellant's conduct amounted to an assault consummated by a battery on Petty Officer W.[5]

 Next we consider whether the remaining element was adequately established, *i.e.*, whether the assault-by-unwarned-sexual-intercourse was a "means or force likely to produce death or grievous bodily harm." Specifically, is it possible that ostensibly-protected sexual intercourse can constitute such a means or force? Clearly, intimate sexual contact is one of the two primary means of HIV transmission (the other being intravenous drug use). Use of a condom only separates the victim from HIV-laden seminal/vaginal fluid by a few millimeters of latex. Further, the risks of breakage, spillage, defective workmanship, improper or careless usage, and even permeability under certain circumstances are well documented and were well known to appellant. *See United States v.*

*Joseph*, 33 MJ at 963 n.2. At best, use of a condom does not translate into "safe sex," but potentially "safer sex."

 Depending on the circumstances of a particular case, we believe a factfinder could rationally find even ostensibly protected intercourse to be a "means ... likely to produce death or grievous bodily harm." INDEED, ANY TIME A PERSON WILL-FULLY OR DELIBERATELY EXPOSES AN UNSUSPECTING VICTIM TO A DEADLY OR DEBILITATING DISEASE OR INFECTION, SUCH AS HIV, POLIO, HEPATITIS B, OR CERTAIN VENEREAL DISEASES, THE ACTOR MAY BE LIABLE FOR AN AGGRAVATED ASSAULT—OR WORSE. Certainly in the case of HIV, we will not hold, as a matter of law, that every superficial use of a condom provides a complete bar to prosecution.

In addition, we do not construe the word, "likely," in the phrase, "likely to produce death or grievous bodily harm," as involving nice calculations of statistical probability.[6] If we were considering a rifle bullet instead of HIV, the question would be whether the bullet is likely to inflict death or serious bodily harm *if* it hits the victim, not the statistical probability of the bullet hitting the victim. The statistical probabili-

---

proof of a touching by HIV-laden semen would also constitute an assault does not bar proof of other types of assault.

5. The instant case was tried by a military judge sitting alone, pursuant to appellant's trial request. Therefore, the judge had no occasion to give instructions on findings, and no special findings were requested by the defense. Thus the record does not disclose the military judge's actual thought processes in arriving at the conclusion that appellant committed an aggravated assault. We assume that the judge understood the law and correctly applied it. *United States v. Harper*, 22 MJ 157, 164 (CMA 1986).

We recognize further that "informed consent" can convert what might otherwise be an offensive touching into a non-offensive touching. In addition, we acknowledge that the defense of "assumption of the risk," in some circumstances, supplies a defense to what might otherwise be an assault. As neither of these two factors was involved in this case, however, we

have no occasion to determine how they might apply to these facts.

6. *See also* paragraph 54c(4)(a)(ii), Part IV, Manual, *supra*, which provides:
> When the *natural and probable consequence* of a particular use of any means or force would be death or grievous bodily harm, it may be inferred that the means or force is "likely" to produce that result.

(Emphasis added.)

We have held that the natural and probable consequence of having *unprotected* sexual contact with someone who tests positive for HIV is death or serious bodily harm. *See United States v. Johnson*, 30 MJ 53, 57 (CMA), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990); *United States v. Stewart*, 29 MJ 92, 93 (CMA 1989); *United States v. Womack*, 29 MJ 88 (CMA 1989); *United States v. Woods*, 28 MJ 318, 319 (CMA 1989). Thus deliberately exposing another to seminal fluid containing HIV is clearly a means likely to produce death or grievous bodily harm and, therefore, can be an aggravated assault.

ty of hitting the victim need only be "more than merely a fanciful, speculative, or remote possibility." *United States v. Johnson*, 30 MJ 53, 57 (CMA), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990).

■ Likewise, in this case, the question is not the statistical probability of HIV invading the victim's body, but rather the likelihood of the virus causing death or serious bodily harm *if* it invades the victim's body. The probability of infection need only be "more than merely a fanciful, speculative, or remote possibility." *Id.*

In the instant case, appellant well knew that condoms did not provide absolute protection and could not be considered "invariably" reliable. *See United States v. Joseph*, 33 MJ at 965. Further, taking the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia* and *United States v. Turner*, both *supra*, Petty Officer W testified that she had not engaged in sexual intercourse for approximately 1 year before she had sexual relations with appellant, and intercourse was therefore difficult. Also, according to her testimony, the condom appellant used, albeit grudgingly, was dry. These factors served to enhance the possibility of condom breakage. Under the totality of circumstances, we agree that the evidence is sufficient, as a matter of law, for the factfinder to find that unwarned sexual intercourse by an HIV-infected person, even if ostensibly protected by a condom, was an assault with a means likely to cause death or grievous bodily injury.

■ If this application of legal principle translates into a drastic reduction in the sexual "freedom" of the HIV-infected, so be it. According to ancient legal maxim, one's liberty to swing one's arms stops where another's nose begins.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges CRAWFORD and GIERKE concur.

SULLIVAN, Chief Judge (concurring):

I agree with the conclusion of the majority opinion that appellant could be lawfully found guilty of aggravated assault in violation of Article 128(b)(1), Uniform Code of Military Justice, 10 USC § 928(b)(1). Sufficient evidence was admitted in this case to permit a reasonable person to find beyond a reasonable doubt that appellant assaulted Petty Officer W with a "means or force likely to cause ... grievous bodily harm." *United States v. Johnson*, 30 MJ 53 (CMA), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990); *see Commonwealth v. Brown*, 413 Pa.Super. 421, 605 A.2d 429 (1992). I write to more particularly delineate those legal principles which permit his conviction for the predicate crime of simple assault under the circumstances of this case. *See United States v. Redding*, 14 USCMA 242, 244, 34 CMR 22, 24 (1963); *United States v. Norton*, 1 USCMA 411, 413, 4 CMR 3, 5 (1952). *See generally State v. Lankford*, 29 Del. 594, 102 A. 63 (1917).

This is a case of first impression. This Court in *United States v. Stewart*, 29 MJ 92, 93 (CMA 1989), affirmed a guilty plea for aggravated assault where a soldier infected with the "AIDS virus" wrongfully engaged in sexual intercourse with a female soldier "without using a condom or any other form of barrier protection." In *United States v. Johnson, supra*, this Court affirmed a contested finding of guilty to aggravated assault where the infected soldier did not disclose his disease and did not use a condom. 30 MJ at 55. Judge Cox, writing for the Court, anticipated appellant's case in footnote 8 of that decision, stating:

> This leaves open a question as to what offense, if any, appellant would have been guilty of if he had worn a condom throughout, though still not informing JPH of his infection, thereby arguably not attempting conduct which would have subjected JPH to the risk of contracting the AIDS virus.

The majority opinion herein expressly confronts two issues which arise under Ar-

ticle 128 as a result of the evidence that a condom was used. First, does this evidence somehow preclude a finding that appellant's act of sexual intercourse constituted a substantial step towards or the commission of "bodily harm" on Private W? Second, does this evidence somehow preclude a finding that his act of sexual intercourse was a "means or force likely to produce death or grievous bodily harm"? I agree with its resolution of these questions. My concern, however, is whether evidence that a condom was used precludes a finding that appellant had the requisite criminal intent for conviction of aggravated assault under Article 128(b)(1).[1]

At a judge-alone trial, appellant was found guilty of aggravated assault, in violation of Article 128(b)(1). The challenged specification of which appellant was found guilty states:

Specification: In that [appellant] did, at or near San Diego, California, on or about 22 January 1989, commit an assault upon Journalist First Class [W], U.S. Naval Reserve, by unlawfully having sexual intercourse with her, a means likely to produce death or grievous bodily harm *because, as the said JO2 Joseph then full well knew, his seminal fluid contained a potentially deadly virus (Human Immunodeficiency Virus) which was capable of being transmitted by sexual intercourse, and which rendered sexual intercourse inherently dangerous,* any apparent consent on the part of the said JO1 [W] being nullified by the fact that the said JO2 Joseph

failed to inform her that he was carrying such a virus.

(Emphasis added.)

My starting point in answering the requisite intent question concerning this specification is Article 128 of the Code. It states:

(a) *Any person* subject to this chapter *who attempts or offers with unlawful force or violence to do bodily harm to another person, whether or not the attempt or offer is consummated, is guilty of assault* and shall be punished as a court-martial may direct.

(b) *Any person* subject to this chapter who—

(1) *commits an assault with a* dangerous weapon or other *means or force likely to produce death or grievous bodily harm;* or

(2) commits an assault and intentionally inflicts grievous bodily harm with or without a weapon;

*is guilty of aggravated assault* and shall be punished as a court-martial may direct.

(Emphasis added.)

This Court has recognized three theories for conviction of the predicate offense of simple assault under this statute: First, there is *the attempted battery theory, i.e.,* an assault is an attempt to do bodily harm with unlawful force or violence accompanied by an intent to do bodily harm. *See United States v. Norton,* 1 USCMA at 413, 4 CMR at 5. Second, there is *the threatened battery theory, i.e.,* an assault is an offer to do bodily harm with unlawful force or violence accompanied by an intent to threaten bodily harm. *Id.* Finally, there is *the intentional or culpably negligent battery theory,*[2] *i.e.,* an assault is the inten-

1. The majority opinion does not separately address the intent requirement for conviction of assault consummated by a battery under Article 128(b)(1), Uniform Code of Military Justice, 10 USC § 928(b)(1). Instead, it implies that proof of a deliberate offensive touching (*i.e.,* sexual intercourse without disclosing the known presence of HIV), necessarily proves the requisite intent for assault under Article 128. I think it is more helpful to particularly consider the intent issue in this case in terms of an intent to do or offer bodily harm.

2. Article 128 does not contain the word "battery." However, this Court has repeatedly interpreted the language of this statute to include the prohibition of "assault and battery." *See United States v. Torres–Diaz,* 15 USCMA 472, 35 CMR 444 (1965); *United States v. Mayville,* 15 USCMA 420, 35 CMR 392 (1965); *United States v. Redding,* 14 USCMA 242, 34 CMR 22 (1963); *United States v. Singletary,* 14 USCMA 146, 150, 33 CMR 358, 362 (1963). *See* § 211.1(1)(a) and (b), ALI Model Penal Code, *reprinted in* ALI *Model Penal Code and Commentaries* (Part II) 173 (1980), which includes intentional, reckless, or culpably negligent batteries within simple as-

tional doing of bodily harm or the negligent doing of bodily harm accompanied by a culpable disregard for the foreseeable consequences to others. *See United States v. Redding,* 14 USCMA at 244–45, 34 CMR at 24–25; *see also United States v. Masel,* 563 F.2d 322 (7th Cir.1977), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1496, 55 L.Ed.2d 523 (1978). *See generally* R. Perkins and R. Boyce, *Criminal Law* 173–77 (3d ed.1982).[3]

sault. I also note that this interpretation of our assault statute is not at all unusual. *See* Perkins, *An Analysis of Assault and Attempts to Assault,* 47 Minn.L.Rev. 71, 91 (1962):

> Also, because terms used in criminal definitions are not always limited to their literal meanings, courts sometimes have interpreted "assault," which is an intentional act, to include both an assault and a battery, even though the battery may be an unintentional act, such as an act of criminal negligence. This process has given rise to the age-old assertion that "every battery includes an assault."

*See also Fish v. Michigan,* 62 F.2d 659 (6th Cir.1933); *Commonwealth v. Hawkins,* 157 Mass. 551, 32 N.E. 862 (1893); *cf. State v. Anania,* 340 A.2d 207, 210 (Me.1975).

3. The legislative history of this provision indicates that it is derived from Article of War (AW) 93 and § 48, Naval Courts and Boards (1937). *See* Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., lst Sess. 1233–34 (1949), *reprinted in* Index and Legislative History, Uniform Code of Military Justice (1950).

Paragraph 180k, Manual for Courts–Martial, U.S. Army, 1949, construing the term assault in AW 93, states:

> The intent to do bodily harm may consist of culpable negligence in doing an act which causes personal injury to another or which puts another in reasonable fear of bodily injury. *See* 180*a* (Manslaughter) for discussion of culpable negligence.

1949 Manual, *supra* at 245.

Moreover, later in discussing battery that paragraph of the Manual goes on to state:

> If the injury is inflicted unintentionally and without culpable negligence, the offense is not committed.

*Id.* at 246.

4. TC: *Your Honor, clearly what we have from the 22d of November [to] January 1989 is a battery.* As a bare minimum, Petty Officer Joseph had sexual intercourse with [W] without getting an informed consent. He touched her without telling her what he was touching her with. He never told her he was HIV positive, never told her of the risks. He never

Turning to the record in this case, I note that trial counsel labeled his theory of criminal liability under Article 128 as a battery but articulated it in terms of culpably negligent conduct.[4] Basically, he argued that appellant committed a battery upon Petty Officer W by engaging in sexual intercourse with her without securing her informed consent. He evidenced the fact that appellant tested positive for HIV; that appellant was apprised of his medical condi-

discussed with her at all the inherent danger in terms of having sexual intercourse with a person who's HIV positive. *He risked her. He risked transmitting the disease to her.*

\* \* \*

[W] says that when he withdrew, the condom was broken. Petty Officer Joseph says it wasn't. Your Honor, that difference doesn't matter *because effectively what John Joseph did was put a safety on and risked that it was going to fail. He risked that the result of his action was going to be infecting* [W]. It's no different than if he took a gun that was loaded and pointed it at her chest, put the safety on, and just for the sheer pleasure of pulling the trigger, pulled the trigger. If the gun fired that's an aggravated assault. It doesn't matter that the statistical probability of that safety failing is that low. It can be nonexistent almost. But once the safety fails, it's an aggravated assault, if not beyond.

*What we have here is a safety that failed and an aggravated assault.*

These products will probably be regarded as useful for people who feel that sex is important, but should not be considered as a guarantee. But that's what he considered it; as a guarantee that he wasn't going to injure his sex partner. But that's not the issue. It's not what he thought as to whether or not he acted recklessly. First he tried to have sex with her without even using a condom. Then once he used a condom, it failed. He never told his partner and he tried to reinitiate sex after they had stopped. *That conduct is reckless. That indicates that he just didn't care about his partner, didn't care what risks he was inflicting upon her, and the risk is death or grievous bodily harm in the terms of the law, the real risk is AIDS.*

We are not talking about hysteria. We're talking about the present ability to inflict an injury and the use of that present ability.

The accused had sexual intercourse with [W] while he was infected with the HIV virus and that is sufficient to reach a finding of guilty to aggravated assault and we would ask that you do that.

[ (Emphasis added.) ]

tion by naval personnel; and that he was counseled on its deadly potential for himself and others. In particular, evidence was admitted that appellant was told that it was important to inform all his future sexual partners of his condition and that sex with a condom was not absolutely safe. Finally, the Government evidenced that appellant failed to disclose to Petty Officer W that he was infected with HIV; that this deadly virus could be communicated to her with or without a condom; that the condom ripped; and that his sex partner later tested positive for HIV.

The above evidence and argument suggests appellant's conviction for assault was on the basis of a theory of negligent battery. The fact that a condom was used and evidence of appellant's belief that he was engaging in safe sex was some evidence that appellant did not have an intent or purpose to do bodily harm, *i.e.*, expose her to the virus. However, as noted above, our case law does not necessarily require an intent to do bodily harm for conviction of assault or aggravated assault under Article 128. *See United States v. Redding, supra.*[5] Accordingly, it is to the third theory of assault that I turn.

The proof, noted above, was some evidence from which a rational factfinder could reasonably find or infer beyond a reasonable doubt that appellant committed a culpably negligent battery under Article 128. In this regard, I note that it is well established that it is a negligent act for a person with a communicable disease to engage in sexual intercourse without disclosing that medical condition to the partner. *See United States v. Dumford*, 30 MJ 137, 138 n.2 (CMA), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). *See generally Mussivand v. David*, 45 Ohio St.3d 314, 544 N.E.2d 265, 269 (1989); *Berner v. Caldwell*, 543 So.2d 686, 688–89 (Ala.1989); *B.N. v. K.K.*, 312 Md. 135, 538 A.2d 1175, 1179 (1988); *R.A.P. v. B.J.P.*, 428 N.W.2d 103, 108 (Minn.App.1988). Moreover, evidence was introduced that appellant was aware of the potential for communicating his infection by sexual intercourse both with or without a condom and the deadly consequence thereof. *Cf. United States v. Redding*, 14 USCMA at 245, 34 CMR at 25. Finally, bodily harm in the form of direct exposure to HIV was evidenced by the ripped condom and the victim's positive testing for HIV. *Id.* Accordingly, there was some evidence in this case that appellant committed an assault under the culpably-negligent-battery theory.

Of course, the evidence in this case also reasonably supports an alternative finding that appellant committed an assault under the "attempt" theory of Article 128 by attempting to expose his sex partner to HIV. *See generally United States v. Johnson, supra.* First, an attempted assault requires an overt act amounting to more than mere preparation which tended to effect bodily harm. Evidence was admitted in this case that appellant and Petty Officer W engaged in sexual intercourse

---

5. W. Clark and W. Marshall, *A Treatise on the Law of Crimes* § 191 at 242 (4th ed.1940), describes an assault as "an attempt or offer, with unlawful force or violence, to do a corporal hurt to another," and battery as "the actual doing of any unlawful corporal hurt, however slight, to another."

The question of culpable negligence substituting for an intent when bodily harm is done is treated as follows:

§ 197. Accident.—To render one guilty of criminal assault and battery, a criminal intent, or what is equivalent thereto, is necessary. If an injury is inflicted upon another by accident in the doing of a lawful act without culpable negligence, an indictment for assault and battery will not lie.

§ 198. Negligence.—A person who inflicts corporal injury upon another by culpable negligence in doing a lawful act may certainly be guilty of assault and battery for the purpose of a civil action to recover damages. It has been said that he is not liable to indictment, but this is very doubtful.

While there is very little authority on the question, there seems to be no good reason to doubt that a person may be guilty of criminal assault and battery if he intentionally does an act which, by reason of its wanton and grossly negligent character, exposes another to personal injury, and does in fact cause such injury. Throwing a stone in sport and striking another is an assault and battery.

Clark and Marshall, *supra* at 249–50 (footnotes omitted).

with a condom and that direct, albeit limited, exposure to HIV could be accomplished by this act. Second, this type of assault also requires proof that the accused intended to do bodily harm with unlawful force or violence. Here, evidence was admitted that appellant, who knew that he carried HIV and that it could be spread by sexual intercourse, initially wanted to engage in sexual intercourse with Petty Officer W without a condom but desisted only on her refusal. In addition, evidence was admitted that he used a condom with knowledge that it was not 100% effective in preventing contraction of HIV. He at no time disclosed either his medical condition or his knowledge of a condom's lack of total effectiveness against it to Petty Officer W. Viewed in its entirety, this was some evidence from which a reasonable factfinder could find that appellant intended to expose his sex partner to HIV. *See generally* W. Clark and W. Marshall, *A Treatise on the Law of Crimes* § 214 at 265 (4th ed.1940), *citing, inter alia, State v. Lankford*, 29 Del. 594, 102 A. 63 (1917).[6]

An additional problem arises in this case with respect to the victim's purported consent to sexual intercourse with appellant if he used a condom. Since appellant did use a condom, it was argued at trial that he did not use unlawful force or violence when he engaged in protected sex with Petty Officer W. *See United States v. Singletary*, 14 USCMA 146, 149, 33 CMR 358, 361 (1963). *See generally Guarro v. United States*, 237 F.2d 578 (D.C.Cir.1956). However, it was clearly established at this court-martial that appellant did not disclose his medical condition of being infected with the HIV virus and that he knew a condom was not absolutely effective in preventing the transmission of this disease. These are material facts whose withholding vitiates consent or would permit a factfinder to so find. *See United States v. Dumford*, 28 MJ 836, 839 (AFCMR 1989), *aff'd* 30 MJ

137 (CMA), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). *See generally* Clark and Marshall, *supra.*

Finally, I note that the *per se* condom rule proffered by appellant must be rejected. As noted by Judge Cox, there is simply no evidence in this case that a condom absolutely prevents contraction of HIV. Moreover, no other scientific or legal authority has been presented to this Court to establish the invincibility of this method of protection. In fact the evidence of record, as noted by the Court of Military Review, uncontrovertedly established that some risk of exposure, although less than unprotected sex, still existed. Accordingly, in light of *United States v. Johnson*, 30 MJ at 57, the question of law before us is whether the risk-of-exposure-to-HIV evidence in this case was "at least ... more than merely a fanciful, speculative or remote possibility." I agree with Judge Cox that the medical evidence in this case met this standard and that the members could lawfully decide whether the means of sexual intercourse was "likely to produce ... grievous bodily harm."

WISS, Judge (concurring in the result):

I

Most judges—including those on this Court—profess to reject lawmaking as an appropriate aspect of their judicial role. The propriety of such judicial restraint surely is no more clear, in terms of both sound government and constitutional principles, than in the context of substantive criminal law.

The process of criminalizing certain conduct is a uniquely political (viz., legislative) one: It is an exercise that requires candid suggestion that a particular act is socially unacceptable; public debate on the efficacy of that suggestion and the perimeters that society will insist or permit be drawn

---

**6.** This legal treatise recognizes a "difference of opinion as to whether a man who has intercourse with a woman with her consent, and communicates a venereal disease, is guilty of an assault because of her ignorance of the fact that

he is diseased." It distinguished the case holding no assault on the basis of the status of the victim as the defendant's wife. Clark and Marshall, *supra,* § 214 at 265 n. 143.

around proscribed activity; and ultimately an up-or-down vote by lawmakers as to whether, after all, the act will be criminally condemned. It is, thus, a process that is distinctively one to be followed by the politically responsive and politically responsible elements of government.

In this scheme, courts and the judges on them are law-takers in the substantive criminal-law context, not lawmakers. We must resist the call that occasionally is voiced that asks us to act where others have not to proscribe a particular act or course of action as criminal.[1] It is a call for a political decision, not for a legal one, and that decision is not within the province of courts to make. *See generally United States v. Lawson*, 36 MJ 415, 423 (CMA 1993) (Wiss, J., concurring in the result).

In other words, when the Government comes before a court of law and tries to fit a round peg of conduct into a square hole of a punitive statutory provision, it is not the proper function of the court to reshape the hole so that it will accept the peg and, in the process, distort the hole's character. Rather, it is the proper limit of the court's function to consider whether the hole—politically determined—already is large enough so that the peg fits within it.

This case illustrates a most troubling social dilemma, made so by the mutual presence of several factors. The physical act that underlies the claimed prohibition reflects one of but a few of the most fundamental, instinctive urges of those in the animal kingdom. That act, however, arises in the context of its being a significant vehicle for the spread of one of the most feared and fearsome health threats that

has faced humanity. Without doubt, the question of whether acting out the instinctive urge of sexual activity should be curbed—and, if so, at what point and under what circumstances—is a vexing social/political topic. It is not, however, an appropriate legal issue before a court of law.

Nonetheless, no court, including this one, can entirely avoid the matter. Until such time that the social/political conversation is had in the political compartments of government, courts have been and will be faced with prosecutorial efforts to proceed with whatever tools that arguably are presently available. The legal difficulty, of course, is that none of those tools was created with the idea then in mind that it should be crafted for this sort of situation.

Thus, the round peg and the square hole.

## II

The Government in this case has elected to prosecute appellant's activity as an aggravated assault, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. Much of the debate by the parties in this Court has concerned whether appellant's infected semen, under all the circumstances involved here, was a means likely to produce grievous bodily harm—that is, whether there was *aggravation*. I agree with my colleagues' treatment of that dispute.

Before there can be an *aggravated* assault, however, there must be an *assault*, *see* Art. 128(b)—and that more fundamental question is given such quick notice in the majority opinion as to be virtually unaddressed there.[2] Moreover, despite the

---

1. Or, indeed, to *de*criminalize a particular act or course of action that a statute makes criminal. *See United States v. Henderson*, 34 MJ 174 (CMA 1992); *accord United States v. Fagg*, 34 MJ 179 (CMA), *cert. denied,* —— U.S. ——, 113 S.Ct. 92, 121 L.Ed.2d 54 (1992).

2. The majority's effort to avoid this discussion is not logically developed. In footnote 3 of that opinion, 37 MJ at 395, the majority points to the fact that sexual intercourse is "a deliberate, physical touching" and from that springs to the conclusion that, accordingly, it does not "need to ponder whether an intentional touching satis-

fies an 'attempt-to-do-bodily-harm' theory or an 'offer-to-do-bodily-harm' theory." Instead, the majority suggests that all it needs to concern itself with is "whether this touching *constituted* 'bodily harm' and whether it was done 'in a manner likely to produce death or grievous bodily harm.'"

This totally overlooks the fact that the act of assault is not *sexual intercourse* but, rather, was the *touching of appellant's lover with appellant's HIV-infected semen.* Under the majority's view, if a man—who was HIV-infected but did not know as much—had sexual intercourse with a

implication in the majority opinion to the contrary, *United States v. Womack*, 29 MJ 88 (CMA 1989), and *United States v. Woods*, 28 MJ 318 (CMA 1989), were not even assault cases—the former was a prosecution under Article 90, UCMJ, 10 USC § 890, for violating a "safe-sex" order, and the latter was a prosecution under Article 134, UCMJ, 10 USC § 934, for engaging in an inherently dangerous act by unprotected sex with another while knowing the presence of HIV infection and its consequences. Although *United States v. Stewart*, 29 MJ 92 (CMA 1989), was a prosecution under Article 128, it involved sex without use of a condom or any other barrier to the infected semen. The same is true of *United States v. Johnson*, 30 MJ 53 (CMA), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990)—the only other case in our precedents where an HIV-related sexual act was charged as an assault under Article 128. Thus, none of these cases is particularly helpful in determining whether there was an assault at all in this case.

The Chief Judge, though, does extensively analyze this question, but in the process he embraces a questionable theory not necessary to resolve this case. He concludes not only that there was an assault under the "attempt" theory, 37 MJ at 400–401, with which I agree for reasons to be stated

infra, but also that there was an assault under some theory of a culpably negligent battery. 37 MJ at 400–401. The majority reaches a similar determination, when it holds that reasonable factfinders could find a battery in this case and that "[i]t is black letter law that every battery includes an assault" (37 MJ at 395)—with the unstated but necessarily implied conclusion that all batteries, thus, are within the scope of Article 128.[3]

I would prefer not to write on this expanded expoundment of the law of assault, since it does not seem to be within the granted issue and certainly was not briefed or orally argued in this Court; I would prefer, instead, to limit this aspect of our decision on the granted issue to concluding, as I do, *infra*, that an assault could be found here under the "attempt" theory.

Nonetheless, the views expressed by the majority and separately by the Chief Judge, summarized above, prod me, reluctantly, to explore beyond this limited border. The language of Article 128 legislatively establishes both the crime of assault and the limits of that crime, and this Court is bound by those legislative limits. I am not convinced that that language permits the majority's conclusion that "every battery includes an assault" as Congress has defined assault for us; instead, I believe that the majority has reached that conclu-

woman and she became infected as a result, he would be guilty of criminal assault: The sexual intercourse was a deliberate physical touching and the touching constituted bodily harm. As this hypothetical illustrates, the need to address the various theories of assault and to determine which are available under Article 128 hardly is a "collateral, academic discussion," as the majority asserts. 37 MJ at 395 n.3. Instead, I view it as the heart of this case, and I regret that the majority does not engage in the discussion.

**3.** In this respect, the majority, like the Chief Judge, appears to have seized a license to articulate a theory of guilt under Article 128 that arguably is not found in the statutory language. Borrowing from the President's view of the scope of Article 128, the majority summarizes the elements of an offense under that provision to include the possibilities of an accused who "'attempted to do, offered to do, or did bodily harm to a certain person.'" 37 MJ 395 n.2. *See* para. 54b(1), (2), and (4), Part IV, Manual for

Courts–Martial, United States, 1984. The Court, in an opinion again authored by Judge Cox, uncritically wrote similarly in *United States v. Johnson*, 30 MJ 53, 56 (CMA), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990), relying on paragraph 54b(4).

I simply note here that reference to the statutory language itself does not appear to uncover a *third* theory of proscription. *See* opinion, *infra*. Whether bodily harm actually is inflicted appears to be specifically irrelevant under our statute as to whether an assault was committed; instead, that question seems to be limited to whether the accused *"attempts or offers"* with unlawful force or violence to do bodily harm to another." Art. 128(a) (emphasis added). If so, any more expanded view by the President of Article 128's scope is legally insignificant. *See United States v. Mance*, 26 MJ 244, 252 (CMA), *cert. denied*, 488 U.S. 942, 109 S.Ct. 367, 102 L.Ed.2d 356 (1988); *United States v. Cothern*, 8 USCMA 158, 23 CMR 382 (1957); *United States v. Jenkins*, 7 USCMA 261, 22 CMR 51 (1956).

sion through flawed logic. I am not convinced, either, that that language includes a culpably negligent battery within the scope of "assault" as Congress has defined it; the legal authorities relied upon by the Chief Judge are infirm support for his conclusion that it does.

A

My beginning must be the statute. In the section that is relevant to the underlying crime of assault, Article 128(a) provides:

Any person subject to this chapter who attempts or offers with unlawful force or violence to do bodily harm to another person, whether or not the attempt or offer is consummated, is guilty of assault and shall be punished as a court-martial may direct.

It seems entirely clear that Congress, thus, has carefully and specifically *defined* what it has chosen to proscribe as "assault": *an attempt or offer* with unlawful force or violence to do bodily harm to another. It seems just as clear that Congress, thus, has made it legally immaterial "whether or not the attempt or offer is consummated"—that is, whether a *battery* occurs.

The undeniable language of Article 128, therefore, would appear to have two results. If an act constitutes an attempt or offer, it may be an assault whether or not a battery occurs; conversely, even if an act occurs that at common law or in other jurisdictions constitutes a battery, it is not within Article 128 unless it is an offer or attempt.

The former needs no amplification. The latter, however, might benefit from illustration. Example: A man carries gasoline in a glass bottle in the trunk of his car to use if he runs out of fuel, and he intends to harm no one with it; yet, it explodes and injures a nearby pedestrian. Likely, under most definitions of that term, the man has committed a battery by doing bodily harm to another through his culpable negligence. It would seem just as likely, though, that his act does not fall within either the attempt or offer theories of assault: He did not "specific[ally] inten[d] to inflict bodily harm," *see* para. 54c(1)(b)(i), Part IV, Manual for Courts–Martial, United States, 1984; and, since the bottle of gasoline was inside the car's trunk, the injured bystander did not see it and so did not apprehend any threat of injury from the man's negligent act, *see* para. 54c(1)(b)(2). Thus, given a statute like Article 128, which specifically defines assault as an offer or attempt—and which thereby also would seem to *limit* assault to an offer or attempt—that man has not committed an assault.

I do not suggest that that result necessarily is desirable. I only suggest that that appears to be the legally required reading of what Congress has chosen to proscribe. The remedy, if any is thought necessary, is to either legislatively expand assault to include a culpably negligent battery or enact a separate battery statute. The remedy is not to judicially distort clear and unambiguous statutory language. I fear, however, that that is what my colleagues do here; and in my view, that amounts to judicial legislation of a substantive crime.

B

In fairness to my colleagues, they are not the first on this Court to apparently enlarge the coverage of Article 128. *United States v. Redding*, 14 USCMA 242, 244, 34 CMR 22, 24 (1963), did acknowledge a theory of a culpably negligent battery as an assault under Article 128, but it did so without any analysis of where that theory may be found in that statute. *United States v. Torres–Diaz*, 15 USCMA 472, 35 CMR 444 (1965), did the same, relying heavily on *Redding*. The *Torres–Diaz* opinion quoted a passage from *Redding* in which the Court had drawn an analogy to " 'involuntary manslaughter, which of course may be committed by culpable negligence.' " 15 USCMA at 474, 35 CMR at 446, quoting *United States v. Redding*, 14 USCMA at 244, 34 CMR at 24. Regrettably, the Court in each case overlooked the fact that Congress had expressly articulated culpable negligence as a theory of manslaughter in Article 119(b)(1), UCMJ, 10

USC § 919(b)(1), in contrast to resounding silence in that regard in Article 128. It would seem that, when Congress wanted to criminally punish culpably negligent conduct, it knew how to do so.[4]

In addition to the precedents of this Court—precedents without obvious legal foundation in the statute (or, indeed without even any attempt to *find* legal foundation)—the Chief Judge relies on civilian case law and commentary to support this theory of assault by culpably negligent battery. The harsh light of critical examination, however, reveals these looming, seemingly imposing shadows to be inconsequential to this analysis. For instance, *United States v. Masel,* 563 F.2d 322 (7th Cir.1977), cert. denied, 435 U.S. 927, 98 S.Ct. 1496, 55 L.Ed.2d 523 (1978), involved a statute different from ours; and R. Perkins and R. Boyce, *Criminal Law* at 173–77 (3d ed. 1982), simply nowhere suggests that a statute, like ours, that *itself defines assault as limited to "attempt" or "offer" to do bodily harm* (whether or not the bodily harm actually is inflicted) also somehow includes a third option of culpably negligent battery.

Of some importance, it should be noted that, as the Chief Judge candidly acknowledges, the discussion from W. Clark and W. Marshall, *A Treatise on the Law of Crimes* § 191 at 242 (4th ed.1940), in footnote 5 of his opinion, 37 MJ at 400, distinguishes between the crime of assault that is created by language virtually identical to Article 128, on the one hand, and a battery, on the other. The Chief Judge also makes clear that the discussion there of the role of culpable negligence is limited to a battery and does not extend to an assault as that treatise—and Article 128—define assault.

The Chief Judge's quotation from Perkins, *An Analysis of Assault and Attempts to Assault,* 47 Minn.L.Rev. 71, 91 (1962), is no more helpful to him. Indeed, my careful reading of the quoted passage—as well as an unquoted earlier portion of the same paragraph—points up the likely error of such a reading of Article 128:

Originally, "assault" as a criminal offense meant an attempt to commit a battery, while "assault" as a tort meant an intentional act wrongfully placing another in apprehension of receiving an immediate battery. The original concept of criminal assault has been changed by the incorporation of the tort concept and by the addition of a requirement of present ability.... Also, because terms used in criminal definitions are not always limited to their literal meanings, courts sometimes have interpreted "assault," which is an intentional act, to include both an assault and a battery, even though the battery may be an unintentional act, such as an act of criminal negligence....

The clear language of Article 128 is precisely the type of statute that Perkins referred to as merging the original criminal and tortious concepts of assault—an attempt or offer to do bodily harm. The interpretation of "assault" that "courts sometimes have" rendered as including criminally negligent battery, however, does not appear available to *this* Court, simply because—apparently unlike the statutes in the cases that Perkins had in mind—our statute *defines* "assault." In this context, a holding by this Court that Article 128 includes a culpably negligent battery would not be an "interpretation"; it would be legislation.[5]

Finally, similar comments apply to the Chief Judge's reliance on the roots of Arti-

4. The other two cases cited by the Chief Judge—*United States v. Mayville,* 15 USCMA 420, 35 CMR 392 (1965), and *United States v. Singletary,* 14 USCMA 146, 33 CMR 358 (1963)—merely casually accept that "assault and battery" is included within Article 128.

5. For the same reason, this Court is not free to interpret Article 128 to include culpably negli-

gent batteries simply because, as the Chief Judge writes, § 211.1(1), ALI Model Penal Code, *reprinted in* ALI *Model Penal Code and Commentaries* (Part II) 173 (1980), does so. The Model Penal Code is a subjective expression of what *ought* to be law; Article 128 *is* the law for the military justice system.

cle 128—Article of War (AW) 93 and § 48, Naval Courts and Boards (1937). AW 93, headed "Various Crimes," made unlawful "manslaughter, mayhem, arson, burglary, housebreaking, robbery, larceny, perjury, forgery, sodomy, *assault with intent to commit any felony, assault with intent to do bodily harm with a dangerous weapon, instrument, or other thing, or assault with intent to do bodily harm.*" (Emphasis added.) In the context of such a congressionally undefined "assault," the President's interpretation in paragraph 180*k*, Manual for Courts–Martial, U.S. Army, 1949, which the Chief Judge quotes in footnote 3 of his opinion, was consistent with what Perkins says other courts have done with similarly unrestricted legislation.[6] As already pointed out, though, Article 128 does not leave "assault" similarly undefined or unrestricted.

As for § 48, Naval Courts and Boards, that provision actually contradicts the expansive reading of the language in Article 128. Section 48 refers to "[s]triking and assaulting his superior officer" and includes "[s]triking," "[a]ssaulting," "[a]ttempting" to strike, and "[t]hreatening" to strike a superior officer while in the execution of his office. The third paragraph of Article 4 of the Articles for the Government of the Navy (AGN), which § 48 concerns, mirrors this language: "strikes or assaults, or attempts or threatens to strike or assault...." The language of both AGN 4 and § 48 of Naval Courts and Boards obviously is reflected in Article 128's coverage of attempts or offers to do bodily harm, whether the harm is inflicted; it just as obviously is *not* a basis for crea-

tive interpretation of Article 128 to include a culpably negligent battery.

## III

The struggle reflected in this discourse, fortunately, does not deter a reasoned disposition of the instant appeal. Under the "attempt" theory of violation of Article 128, the crime is shown by proof of a specific intent to inflict bodily harm and an overt act that amounts to more than mere preparation. *See* para. 54c(1)(b)(i), Part IV, 1984 Manual, *supra*. Appellant knew he was infected with HIV; he knew its communicable nature and the danger it offered a sex partner; he knew that certain steps, like use of a condom, would significantly reduce that threat; yet, there was evidence that he was willing and imminently prepared to have sex with Petty Officer W without taking any protective steps and without advising her of the risk that that presented—indeed, the evidence reflects that he acquiesced to obtaining and using a condom only when Petty Officer W issued the ultimatum of that or nothing.

I agree with the Chief Judge that this furnished an adequate evidentiary basis upon which reasonable factfinders could find that appellant specifically intended to inflict bodily harm on Petty Office W. *See generally United States v. Stewart*, 29 MJ 92 (finding aggravated assault where act of sex was by HIV-infected accused who knew the risks attendant to that act but who did not use any protective barrier and who did not advise sex partner of his condition). Specifically reserved, in my view, is any decision regarding other hypothetical factual scenarios and how they may or may not fit into one of the "square holes" of the UCMJ as it now exists.

---

6. Ironically, notwithstanding the broad presidential interpretation quoted by the Chief Judge, the sample specification (#96) suggested for "Assault with intent to ... do bodily harm" under Article of War 93 was limited to one who, "did, ... with intent to ... (do him bodily harm), commit an assault ... by feloniously and willfully (striking)([or other offensive touching of])" the victim. *See* Manual for Courts–Martial, U.S. Army, 1949 at 324. There was no mention of any culpably negligent striking or other culpably negligent battery.