UNITED STATES

v.

Michael M.A. BYGRAVE, 050–62–5753, Boatswain's Mate Second Class (E–5), U.S. Navy.

NMCM 92 01737.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 25 March 1992.

Decided 30 Aug. 1994.

Capt Dwight H. Sullivan, USMC, Appellate Defense Counsel.

Maj Steven P. Hammond, USMC, Appellate Defense Counsel.

LT Michael C. Pallesen, JAGC, USNR, Appellate Defense Counsel.

Maj G.W. Fischer, USMCR, Appellate Government Counsel.

Capt Laulie S. Powell, USMC, Appellate Government Counsel.

Before LARSON, C.J., and WELCH and ORR, Senior Judges.

LARSON, Chief Judge:

Contrary to his pleas, the appellant was convicted by general court-martial, military judge sitting alone, of two specifications of aggravated assault under Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928, by wrongfully engaging in unprotected sexual intercourse with two different women while infected with the human immunodeficiency virus (HIV).[1]  He was sentenced to confinement for 4 years, forfeiture of all pay and allowances, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.  On appeal, the appellant has assigned seven errors.[2]  We find merit in the first assigned error and will take appropriate action in our decretal paragraph.  The second and third assigned errors merit further discussion but no relief.  The remaining assigned errors are rejected without further discussion.  *Weiss v. United States*, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).[3]

1.  The appellant was found not guilty of assaulting a third woman.

2.  I.  THE STAFF JUDGE ADVOCATE ERRED BY FAILING TO DISQUALIFY HIMSELF FROM PREPARING THE R.C.M. 1106 RECOMMENDATION WHERE A LOCAL NEWSPAPER HAD QUOTED HIM OFFERING AN OPINION AS TO THE DETERRENT VALUE OF APPELLANT'S SENTENCE.

II.  THE MILITARY JUDGE BASED HIS DECISION TO ADMIT BM3 CORTEZ'S OUT-OF-COURT STATEMENT TO A NAVAL INVESTIGATIVE SERVICE AGENT ON A CLEARLY ERRONEOUS FINDING OF FACT.

III.  THE FINDING OF GUILTY TO AGGRAVATED ASSAULT CANNOT STAND BECAUSE THE ALLEGED VICTIM CONSENTED TO HAVING SEXUAL INTERCOURSE WITH APPELLANT DESPITE ACTUAL KNOWLEDGE THAT APPELLANT WAS HIV-POSITIVE.

IV.  THE COURT-MARTIAL DID NOT HAVE JURISDICTION BECAUSE THE MILITARY JUDGE WAS NOT APPOINTED TO A FIXED TERM OF OFFICE.  (CITATION OMITTED.)

V.  THIS COURT HAS NO JURISDICTION BECAUSE ITS JUDGES ARE NOT APPOINTED TO FIXED TERMS OF OFFICE.  (CITATION OMITTED.)

VI.  APPELLANT'S COURT-MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.  (CITATION OMITTED.)

VII.  BECAUSE THIS COURT'S JUDGES WERE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE, THIS COURT HAS NO POWER TO REVIEW APPELLANT'S CASE.  (CITATION OMITTED.)

3.  Although our decision to remand this case based upon the first assigned error does not require us to address the remaining issues at this juncture, we have chosen to do so in the interest of judicial economy and, as well, to serve the interests of both parties in knowing the disposition of the substantive legal issues raised in the second and third assignments of error.

## I.

We shall take up the most significant issue presented by this appeal first, i.e., whether knowing consent to unprotected sexual intercourse with a partner who is infected with the HIV is a defense to assault with a means likely to produce death or grievous bodily injury. Despite the appellant's contentions in his third assignment of error, we hold that such consent is not a defense.

For the most part, the pertinent facts are not in dispute. In late 1986, while assigned to a ship, the appellant was informed by his commanding officer that he had tested positive for the HIV.[4] He was immediately transferred to Balboa Naval Hospital in San Diego where he commenced a course of instruction and evaluation for HIV-infected individuals. Record at 120. The course included sessions in which the patients were advised not to engage in sexual intercourse without warning their partners of their infected status and without protection. The appellant testified that he did not remember actually learning this information, but he did acknowledge attending some classes during his 2-week stay at Balboa as well as signing for receipt of the information in written form. Record at 133, 138.

The appellant was then transferred to Naval Amphibious Base, Coronado, California, where, in 1987, he met Petty Officer Second Class J. Record at 100. They became regular sexual partners throughout most of 1988. The appellant never informed Petty Officer J that he had tested positive for the HIV; in fact, he specifically denied having any sexually transmitted disease. Furthermore, for a significant portion of their time together, he did not use condom protection during sexual intercourse. Record at 102. In late June or early July, Petty Officer J was informed that she had tested positive for the HIV. She testified that sexual intercourse with the appellant was the only possible source of the virus and that, when she confronted him with her infection, he admitted that he too had tested positive. Record at 104. Eventually,

their relationship dissolved. Record at 127. In February 1989, the appellant returned to Balboa Naval Hospital where he was again informed as to the nature of his infection and the protective measures he must take regarding sexual intercourse. Record at 127.

In January 1990, the appellant became sexually involved with Petty Officer Third Class C and they began living together about 1 year later. According to Petty Officer C, before they engaged in intercourse, the appellant informed her that he was HIV-positive. He also used condoms during intercourse except for one or two occasions. In July 1991, Petty Officer C was informed that she had tested positive for the HIV. In her pretrial statement, she expressed certainty that she had contacted the virus from the appellant. Prosecution Exhibit 2.

## II.

Our analysis of the consent issue begins by noting that the question arises only with respect to the Additional Charge and specification, i.e., the offense involving Petty Officer C. It is abundantly clear that the appellant's other victim, Petty Officer J, was unaware that he was infected. Therefore, although Petty Officer J consented to sexual intercourse, she did not consent to the risk of infection.

In *United States v. Woods*, 27 M.J. 749 (N.M.C.M.R.1988), *aff'd*, 28 M.J. 318 (C.M.A. 1989), this Court addressed but did not decide the issue of consent as a defense. Woods was charged with unprotected sexual intercourse in violation of Article 134, UCMJ, 10 U.S.C. § 934, rather than assault. Also, in that case, the military judge had dismissed the charge and specification for failure to state an offense, and the case was before this Court pursuant to a Government appeal under Article 62, UCMJ, 10 U.S.C. § 862. The question before the Court was whether the failure to allege in the specification that the accused failed to inform his partner that he was infected was a fatal defect. The Court

4. The HIV is a progressive virus that attacks certain white blood cells and eventually develops into anti-immunity deficiency syndrome, commonly known as AIDS, which will lead to death for 90% of those infected. Record at 58–60. It is known to be transmitted through seminal fluid released during sexual intercourse, sharing of needles used by infected drugs users, blood transfusions from infected donors, and from mother to child through pregnancy.

concluded that the specification need not allege the lack of informed consent as an element of the offense but reserved judgment as to whether informed consent would be an affirmative defense. *Woods*, 27 M.J. at 753.

In *United States v. Morris*, 30 M.J. 1221 (A.C.M.R.1990), the accused was also charged under Article 134, UCMJ, with wanton disregard for human life by engaging in unprotected sexual intercourse. The victim was aware that Morris was infected before she consented to sex. The Court found that consent was not a defense, noting society's interest in deterring Morris' reckless behavior and stopping the spread of this deadly disease. *Morris*, 30 M.J. at 1228. We find the analysis in *Morris* to be persuasive. We will now look at the application of its holding to the question of informed consent as a defense to unprotected sexual intercourse by an HIV-infected accused brought not as general disorder under Article 134 but as an assault under Article 128, UCMJ.

■■■ The appellant was convicted of assault with a means likely to produce death or grievous bodily harm. The general rule is that, while consent may defeat a charge of simple assault and battery, it will not excuse assault that produces death or serious injury. *See United States v. Joseph*, 33 M.J. 960, 963 n. 1 (N.M.C.M.R.1991), *aff'd*, 37 M.J. 392 (C.M.A.1993); *United States v. Holmes*, 24 C.M.R. 762 (A.F.B.R.1957); *People v. Cruciani*, 36 N.Y.2d 304, 367 N.Y.S.2d 758, 327 N.E.2d 803 (1975); R. Perkins & R. Boyce, *Criminal Law* 1075–76 (3d ed. 1982). There is no dispute in our law that seminal fluid containing the HIV qualifies as a means likely to produce death or grievous bodily harm. *United States v. Johnson*, 30 M.J. 53 (C.M.A.), *cert. denied*, 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990); *United States v. Stewart*, 29 M.J. 92 (C.M.A.1989). It logically follows then that informed consent is no defense to assault by means of HIV-infected seminal fluid passed through unprotected sexual intercourse.

The reasons for eliminating consent as a defense to this form of assault are even more compelling than they are with the traditional forms of aggravated assault. In the latter, generally, only the named victim of the assault suffers (at least directly) or is placed at risk. When the HIV is passed to a specific victim, the potential exists in our society that many more victims will be infected. In giving her misguided consent to infection with a potentially deadly virus, Petty Officer C does not speak for those she might subsequently infect. The fact that, in this case, the victim and the appellant are now married, and presumably monogamous, is hardly reassuring. Marriages dissolve through divorce or death. Moreover, marriages may produce children who are at risk of receiving the HIV from the mother. Record at 59.

The legitimate interest of the armed forces in preventing the spread of AIDS in its ranks and into society at large through the passing of the HIV has been well-recognized by the Court of Military Appeals and need not be revisited here. *See Johnson*, 30 M.J. at 58; *United States v. Womack*, 29 M.J. 88 (C.M.A. 1989). This interest has provided the legal justification for orders against unprotected intercourse by an HIV-infected service member, a subject that otherwise might be considered a constitutionally-protected private matter. *Womack*, 29 M.J. at 91. Surely, it justifies, as well, the elimination of informed consent as a defense to assault by this insidious virus. Accordingly, we hold that informed consent was not a defense to the aggravated assault of which the appellant was convicted in this case.

### III.

■ We now turn to the appellant's second assigned error, i.e., whether the military judge erred by admitting the statement of the victim, Petty Officer C, into evidence under the residual hearsay exception. On 20 January 1992, 3 days after the Article 32, UCMJ, 10 U.S.C. § 832, Investigation, C (who was no longer in the Navy at that time) and the appellant were married. Based on her marital status, she refused to testify against him. Mil.R.Evid. 504(a); Record at 10.

During trial, after the appellant's wife declared her refusal to testify on the merits, the military judge declared her unavailable as a witness. Record at 12. The prosecution

then offered the written statement that she had provided to an agent of the Naval Investigative Service (NIS) on 9 September 1991 under Military Rule of Evidence 804(b)(5), one of the two residual exceptions to the rule against hearsay. The military judge listened to testimony concerning the circumstances surrounding the taking of the statement from the agent and from Mrs. Bygrave.[5] In particular, the appellant's wife testified that she told the agent the truth but that the statement was not entirely accurate. Record at 30. She also testified that the reasons her statement was not accurate were that she was confused and exhausted after an intense 2 weeks of HIV evaluation and instruction. In addition, she said she was scared of the NIS agent who interviewed her and, therefore, just told him what she thought he wanted to hear to get it over with. Record at 26–29. On the other hand, the agent testified that he treated her not as a suspect but as a victim and that she appeared to be calm. Record at 15–17. The military judge found that the statement had sufficient indicia of reliability to justify admission under Military Rule of Evidence 804(b)(5). In support of his ruling, he also made the following factual findings:

A, the declarant, [Mrs.] Bygrave, was at the time of the giving of the statement, a mature adult in full command of her faculties. B, the statement was given under oath. C, the accuracy of the statement was attested to by Mrs. Bygrave's act of proofreading the statement and initialing each paragraph, and D, most importantly, the veracity of the statement was affirmed by Mrs. Bygrave on the stand.

Record at 45.

On appeal, the appellant claims that Prosecution Exhibit 2 was not admissible under Military Rule of Evidence 804(b)(5) because it did not have sufficient indicia of trustworthiness; specifically, that the military judge's finding that Mrs. Bygrave affirmed the veracity of the statement is clearly erroneous because it conflicts directly with her testimony that the statement was not entirely accurate.

First, we should make clear that this issue only concerns the admissibility of Mrs. Bygrave's pretrial statement under the rules of evidence concerning hearsay and its exceptions. The appellant was not denied (and does not claim on appeal that he was) his right to confront the witness against him under the Confrontation Clause of the Sixth Amendment to the United States Constitution because Mrs. Bygrave eventually did testify for the defense. *See United States v. McGrath*, 39 M.J. 158 (C.M.A.1994); *United States v. Yeauger*, 27 M.J. 199, 201 (C.M.A. 1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989); *United States v. Martindale*, 36 M.J. 870 (N.M.C.M.R. 1993).

■ A military judge is granted considerable discretion in determining the admissibility of evidence under the residual hearsay exception. *United States v. Powell*, 22 M.J. 141 (C.M.A.1986). His discretion is particularly wide in his assessment of the indicia of trustworthiness of an out-of-court statement. *Martindale*, 36 M.J. at 877. His decision will not be disturbed on appeal absent a clear abuse of that discretion. *United States v. Lyons*, 33 M.J. 543, 547 (A.C.M.R.1991), *aff'd*, 36 M.J. 183 (C.M.A.1992). "[A]n abuse of discretion involves far more than a difference in opinion. The challenged action must be found to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987).

■ In cases where the declarant is available to testify, the degree of reliability necessary to justify admission under the residual hearsay exception is reduced because of the opportunity for the declarant to explain why a particular statement is or is not accurate. *United States v. Yeauger*, 24 M.J. 835 (N.M.C.M.R.1987), *aff'd*, 27 M.J. 199 (C.M.A.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989). Here, despite her refusal to testify against her

---

5. Mrs. Bygrave agreed to testify only as to the taking of her statement while maintaining her refusal to testify on the merits of the case against her husband. Later, she became "available" as a witness and testified for the defense. This change in availability does not affect the question of admissibility of the statement under the rules of evidence at the time it was offered.

husband on the merits, Mrs. Bygrave was available to testify concerning the circumstances surrounding the taking of the statement, including why the statement was not accurate. Record at 26–31. It is also that very testimony that forms the basis for the appellant's challenge to the conclusion of the military judge that she affirmed the veracity of the statement. He points to her testimony that the statement was inaccurate as evidence that directly contradicts the judge's conclusion, notwithstanding her earlier acknowledgement that she told the agent the "truth." Record at 30.

Although we are not bound by the military judge's findings, *see United States v. Cole,* 31 M.J. 270 (C.M.A.1990), we are inclined to give them great deference. *United States v. Nimmer,* 39 M.J. 924, 927 (N.M.C.M.R.1994). It is particularly appropriate to defer to those findings in a situation like this where the military judge makes an assessment of the veracity of the statement after hearing her testimony concerning that very subject in court. *Yeauger* also involved the admissibility of the statement of the accused's co-actor (the reliability of which is generally viewed with even more suspicion than the statement of a victim) under the residual hearsay exception. In that case, the declarant testified that the statement was false and explained the reasons why he lied to the agent who took the statement. As this Court explained, the declarant's testimony allowed the members to judge the accuracy of his confession and the motives he had for making it. *Yeauger,* 24 M.J. at 838. Likewise, in this case, Mrs. Bygrave explained why some of her statement was inaccurate.[6] She also explained the stressful circumstances surrounding the taking of the statement that led her to sign and initial a statement, even though she knew it to be inaccurate. Therefore, while we agree with the appellant that her testimony concerning the accuracy of the statement is inconsistent, the reasons for the inconsistency were clearly laid out on the record so as to permit the military judge to

accurately assess them and their effect on the reliability of the statement. Consequently, rather than an indication of the untrustworthiness of the *circumstances surrounding the taking* of the statement, her explanatory testimony ultimately afforded the military judge the same opportunity the members had in *Yeauger*—in this case to determine whether Mrs. Bygrave was telling the truth in her statement or at trial, concerning the pivotal question of whether intercourse with the appellant was unprotected.

In addition to the reasons stated by the military judge, we find an additional indication of trustworthiness in the inescapable conclusion that Mrs. Bygrave had no reason to mislead the agent concerning whether or not the appellant used condoms during intercourse. This was not the situation in *United States v. Cordero,* 22 M.J. 216 (C.M.A.1986), or even in *Yeauger,* where the declarant was interviewed as a possible suspect in a crime and had a motive to mislead and, in particular, to shift blame. Mrs. Bygrave was interviewed as a victim, not a suspect, and was only providing a logical explanation for the fact that she had tested positive for the HIV after an intimate relationship with the appellant, himself an HIV carrier, that lasted over 18 months. In the end, we are satisfied that the military judge did not abuse his discretion in admitting Mrs. Bygrave's statement into evidence.

## IV.

■ The appellant also asserts in his first assignment of error that the staff judge advocate who prepared the recommendation to the convening authority under Rule for Courts–Martial (R.C.M.) 1106 was disqualified from doing so because he had made public comments as to the appropriateness of the sentence before he reviewed the record of trial. The pertinent facts are these. The appellant was sentenced on 25 March 1992. On 31 March, a newspaper article appeared in the San Diego Union–Tribune in which the staff judge advocate for the convening au-

---

6. When she testified concerning the reliability of the statement, she declined to identify which portion was inaccurate. Record at 30–31. However, when she testified on the merits for the defense, she stated that the portion that refers to

some instances of sexual intercourse as unprotected was in error. She testified that, in fact, the appellant always used a condom during intercourse, but that there were times when the condoms broke. Record at 147.

thority was quoted as stating, "He just killed two or three people," and "If there is a message here ... a violation will get you serious brig time and the boot from the Navy," in reference to the appellant's conviction and sentence. In a submission to the convening authority pursuant to R.C.M. 1105 and 1106, the trial defense counsel referred to the news article and asked both that another judge advocate be assigned to prepare the R.C.M. 1106 recommendation and that the case be referred to a substitute convening authority for review under R.C.M. 1107. In his recommendation, however, the staff judge advocate asserted that he was not disqualified because of the article because he had been misquoted in the article.

In an affidavit submitted by appellate counsel for the Government, the staff judge advocate states that he did not make the quotes attributed to him by the reporter who wrote the article. He further stated that, during a telephone interview with the reporter, the reporter himself made the comments and attempted to get him to "ratify" them but that he declined to do so. In an affidavit submitted by appellate defense counsel, an appellate counsel unrelated to this case stated that he listened to a phone interview between the assigned appellate defense counsel and the public affairs officer on the convening authority's staff. During that phone conversation, the public affairs officer stated that he had participated in the reporter's interview of the staff judge advocate on another telephone line and that the quotes attributed to the staff judge advocate in the article were accurate representations of the staff judge advocate's comments to the reporter. On the basis of this conflicting information, the appellant asks this Court to return the case for a *Dubay* [7] hearing to obtain sufficient evidence to address this assignment of error.

■■■ An accused is entitled to a fair and impartial post-trial recommendation by one free from any connection with the controversy. *United States v. Crossley*, 10 M.J. 376

(C.M.A.1981); *United States v. Crunk*, 4 U.S.C.M.A. 290, 15 C.M.R. 290 (1954); *United States v. McCormick*, 34 M.J. 752 (N.M.C.M.R.1992). A staff judge advocate is disqualified from making a recommendation to the convening authority concerning under R.C.M. 1106 if he has acted in any of the roles spelled out in Article 6(c), UCMJ, 10 U.S.C. § 806(c).[8] None of these conditions is present here, but they are not exclusive. *United States v. Engle*, 1 M.J. 387 (C.M.A. 1976). A staff judge advocate is also precluded from making a recommendation if he has taken a premature position on the appropriateness of the sentence, i.e., if he is "predisposed." Predisposition is the evil which triggers disqualification. *United States v. Ledbetter*, 2 M.J. 37, 41–42 n. 8 (C.M.A.1976); *Engle*.

■■■ Mere contact with the media concerning procedural aspects of a court-martial would not, by itself, indicate predisposition and, therefore, would not be disqualifying. *See United States v. Parini*, 12 M.J. 679 (A.C.M.R.1981), *petition denied*, 13 M.J. 210 (C.M.A.1982). However, the comments attributed to the staff judge advocate in the appellant's case go far beyond mere procedural matter. They amount to nothing less than an expression of complete satisfaction by the staff judge advocate with the severity of the sentence. Any reasonable observer would conclude that the author of the quoted matter in the newspaper article was predisposed to recommend that the adjudged sentence be approved.

Yet, there is a factual dispute as to whether the staff judge advocate actually made the comments attributed to him. The appellant urges us to return the case for an evidentiary hearing to resolve the dispute. We are not inclined to order such an awkward and costly remedy for what is essentially a matter collateral to the question of guilt or innocence. Nor are we inclined to resolve the precise factual dispute—as to who said what to whom—on the record submitted. Instead,

---

7. *See United States v. Dubay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

8. Article 6(c), UCMJ, reads: "No person who has acted as member, military judge, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case may later act as a staff judge advocate or legal officer to any reviewing authority upon the same case."

we are able to conclude that, at the very least, the staff judge advocate's act of engaging in a discussion of the merits of the adjudged sentence with the newspaper reporter created a fair perception that he was predisposed, whether he attempted to avoid quotable comments or not. "In situations of this kind, the appearance of evil must be as assiduously avoided as the evil itself." *United States v. Sierra–Albino*, 23 U.S.C.M.A. 63, 66, 48 C.M.R. 534, 537 (1974) (Quinn, J., concurring in the result). By granting the interview soon after the appellant was sentenced, the staff judge advocate created the risk that certain fixed positions regarding the merits of the case would be attributed to him. Unfortunately, that risk came to fruition, requiring, at this juncture, a remand for a new staff judge advocate's recommendation and convening authority's action.

Accordingly, the convening authority's action is set aside. The record is returned to the Judge Advocate General for submission to the same or a different convening authority for a new staff judge advocate's recommendation and convening authority's action. Thereafter, the case will be returned to this Court for completion of appellate review under Article 66, UCMJ, 10 U.S.C. § 866.

Senior Judges WELCH and ORR concur.